IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Matthew D. Coldren,                    :

      Plaintiff,                    :

    v.                                 :    Case No. 2:14-cv-1456

Commissioner of Social Security,        JUDGE GEORGE C. SMITH
                                 : Magistrate Judge Kemp

      Defendant.                    :

REPORT AND RECOMMENDATION

I. _Introduction_

Plaintiff, Matthew D. Coldren, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on December 21, 2010, and alleged that Plaintiff became disabled on November 20, 2010.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on March 26, 2013. In a decision dated April 12, 2013, the ALJ denied benefits. That became the Commissioner's final decision on July 11, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on November 10, 2014. Plaintiff filed his statement of specific errors on December 10, 2014, to which the Commissioner responded on February 9, 2015. Plaintiff filed a reply brief on February 23, 2015, and the case is now ready to decide.

II. _The Lay Testimony at the Administrative Hearing_

Plaintiff, who was 30 years old at the time of the administrative hearing and who has a high school education,

testified as follows.  His testimony appears at pages 43-54 of the administrative record.

Plaintiff was a crew leader at a fast food restaurant from 1999-2001.  He subsequently worked as a cashier, and then was employed in the construction industry for eight years.  He was a foreman but also did some hands-on work like hanging drywall.  He stopped working in 2010 due to pain in his knees.  He also testified to a head injury which affected his memory.  The head injury occurred in 2006 when Plaintiff was involved in a car accident.

There were other injuries which occurred in that accident as well.  Plaintiff described having had a titanium rod in his femur, and also problems from breaking his C1 and C2 vertebrae.  He had had physical therapy and injections but still had back pain.  He also experienced mood swings and sleeplessness and had migraine headaches with great frequency.

Plaintiff could sit for half an hour before experiencing numbness in his legs.  He could stand for 45 minutes but would then have to lie down for an hour.  He could walk a block, could not bend over to touch his toes, and could neither squat nor crawl.  He could lift about ten pounds and could not operate foot controls with his right leg.  He had metal in his left arm which caused arthritis in his fingers and hands.  Finally, he could not stay on task very long.

As far as everyday activities are concerned, Plaintiff testified that his mother did the housework.  He had bad days where he did nothing but lie down and use heating pads.  Those days outnumbered his good days.  He left the house once or twice per week for doctors' appointments.  He could drive but did not do much driving because he had problems turning his neck.

III.  The Medical Records

The medical records in this case are found beginning on page

-2-

334 of the administrative record.  The pertinent records - those relating to Plaintiff's two statements of error - can be summarized as follows.

Plaintiff was involved in a car accident on January 11, 2006.  According to notes from the Ohio State University Medical Center, on that day he underwent surgery to repair a broken left leg, two broken bones in his left arm, and a complex laceration in his right leg.  He had another surgery on the right leg on January 23, 2006.  Additional notes show a diagnosis of a C2 fracture which was treated with fixation of a screw and plate.  A month later, he was weight-bearing and was doing well.  He was involved in physical therapy which he was tolerating well except for an increase in pain in his left thigh.  That was considered to be normal.  He was to follow up in three months.  (Tr. 359-60).  He also began to receive treatment at the Marion Pain Clinic.

On April 20, 2006, Plaintiff was seen at the neurosurgery outpatient clinic.  At that time, his neck pain had resolved and he had no weakness, numbness, or tingling in his arms or legs. He was described as "doing well from a neurological point of view" but he was to continue wearing a cervical collar except when in bed or sitting in a chair.  (Tr. 499-500).  There are no records of any treatment in 2007, but in 2008 Plaintiff developed and was treated for a herniation of the right calf muscle.

Four years after the accident, Plaintiff was seen by Dr. Phieffer, who had done the earlier surgeries, reporting substantial leg pain including bilateral knee pain. Neurologically, both of his legs were normal.  Dr. Phieffer did not advise a return to the pain clinic or to narcotic medications and she did not think he could return to heavy labor.  She did describe him as "physically employable," however, and she recommended further treatment for his closed head injury.  She

-3-

also referred him to physical therapy to strengthen his leg muscles. (Tr. 580-81).

As far as any mental impairment is concerned, on June 13, 2006, Dr. Dubey, who had conducted a consultative psychological evaluation, reported that Plaintiff had not sought psychiatric treatment before. He was not working due to his injury and pain. His mood was good but at times irritable due to financial stress. He did not have depression or mood swings. His full-scale IQ was 97. Dr. Dubey rated Plaintiff's GAF at 65, made no psychological diagnoses, and thought that Plaintiff was mildly impaired in only one area, dealing with work stress, and was not impaired in other work-related functions. (Tr. 534-39). A subsequent evaluation was done by Dr. Swearingen on July 21, 2011. Plaintiff told Dr. Swearingen that he stopped working construction due to knee and arm pain as well as headaches, depression, and anxiety. He reported socializing on a daily basis. His mood appeared moderately dysphoric and he reported low energy and anxiety. His full-scale IQ was measured at 71, which fell in the borderline range. Dr. Swearingen diagnosed a depressive disorder, an anxiety disorder, and borderline intellectual functioning, and rated Plaintiff's GAF at 56. He thought Plaintiff could apply instructions requiring average intellectual functioning, could perform simple and multi-step tasks, could get along with others in a work setting, and would have "some difficulty" responding to work stress. (Tr. 661-68).

In addition to these records from treating or examining sources, there are state agency reviewers' evaluations in the record. On the physical side, Dr. Teague concluded that Plaintiff could do light work with some restrictions on his ability to climb, stoop, kneel, crouch, and crawl, and that he should avoid concentrated exposure to workplace hazards. Another state agency physician, Dr. Cruz, concurred with this analysis.

-4-

From a psychological viewpoint, Dr. Semmelman concluded that Plaintiff's condition should be analyzed under three sections of the Listing of Impairments - 12.04 (affective disorders), 12.05 (mental retardation), and 12.06 (anxiety-related disorders); that he did not meet these listings; and that he had moderate limitations in his ability to deal with detailed instructions, cope with work stress, and respond to changes in the work setting.  She thought he could sustain attention and concentration for routine tasks and could adjust to ordinary and routine changes in a work setting which was not fast-paced or did not have more stringent time or production requirements.  (Tr. 62-123).

IV.  <u>The Vocational Testimony</u>

Dr. Jeffrey Magrowski was the vocational expert in this case.  His testimony can be found at pages 54-60 of the administrative record.

Dr. Magrowski was asked to categorize Plaintiff's past work. He said that the fast food crew leader job is generally light and skilled although Plaintiff may have performed it at a heavier exertional level.  The construction foreman job is generally done at the medium level and is also skilled, although Plaintiff performed it at the heavy to very heavy level.  The cashier job is unskilled.

Dr. Magrowski was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level but who could only occasionally work foot controls, occasionally climb ladders, ropes, scaffolds, ramps, or stairs, occasionally kneel, crawl, and balance, and frequently crouch and stoop.  The person also should avoid exposure to moving machinery and unprotected heights and was limited to work of a simple, routine, repetitive nature in a low stress environment.  Dr. Magrowski said that such

a person could be a food worker and could also be employed as a bagger, laundry worker, and housekeeper.  He gave numbers for those jobs in the State and national economies.

Dr. Magrowski next testified that a person could be off task up to 12 percent of the day and still maintain employment. Missing even one day per month in the jobs he identified would lead to termination.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11-33 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015.  Next, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 20, 2010.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including status post 2006 injuries including multiple fractures, traumatic brain injury and a complex right lower extremity wound; osteoarthritis, knees; degenerative disc disorder; migraines; depressive disorder; anxiety disorder, posttraumatic stress disorder; and insomnia. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level except that he could only occasionally engage in the operation of foot controls bilaterally, could only occasionally climb ladders, ropes, scaffolds, stairs, and ramps, could occasionally kneel, crawl, and engage in activities requiring balance, could frequently

-6-

stoop and crouch, had to avoid all exposure to operational
controls of moving machinery and unprotected heights, and was
limited to simple, routine, and repetitive tasks performed in a
low-stress environment defined as requiring only occasional
decision-making and only occasional changes in work setting.
The ALJ next concluded that Plaintiff could do his past relevant
work as a food worker, and in the alternative, the ALJ also
determined that Plaintiff could do certain jobs identified by the
vocational expert, including bagger, laundry worker, and light
cleaner/housekeeper.  The ALJ further found that such jobs
existed in significant numbers in the State and national
economies.  Consequently, the ALJ concluded that Plaintiff was
not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, Plaintiff raises these
issues: (1) the ALJ improperly evaluated Plaintiff's mental
impairments under Listing 12.02; and (2) the ALJ failed to
consider borderline intellectual functioning as a severe
impairment.  These issues are evaluated under the following legal
standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C.
Section 405(g), "[t]he findings of the Secretary [now the
Commissioner] as to any fact, if supported by substantial
evidence, shall be conclusive. . . ."  Substantial evidence is
"'such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402
U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v.</u>
<u>NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere
scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th
Cir. 1976).  The Commissioner's findings of fact must be based
upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435
(6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th

Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

A. <u>Listing 12.02</u>

Under Section 12.02 of the Listing of Impairments, which addresses organic mental disorders, a claimant can demonstrate disability by showing that he or she suffers from a dysfunction of the brain, confirmed by physical examination or laboratory tests, which is accompanied by certain signs and symptoms. There are two ways to satisfy this section - by meeting both the "A" and "B" criteria, or by meeting the "C" criteria.

The "A" criteria are a list of seven different symptoms, including such things as memory impairment, mood disturbances, emotional lability, or, as is most pertinent to this case, "Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels ...." The "B" criteria are the familiar criteria for many mental impairments, and are satisfied by a demonstration of at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration...." Under the alternative way to satisfy this section,

a claimant must show:

> C. Medically documented history of a chronic organic
> mental disorder of at least 2 years' duration that has
> caused more than a minimal limitation of ability to do
> basic work activities, with symptoms or signs currently
> attenuated by medication or psychosocial support, and
> one of the following:
>
> 1. Repeated episodes of decompensation, each of
> extended duration; or 2. A residual disease process
> that has resulted in such marginal adjustment that even
> a minimal increase in mental demands or change in the
> environment would be predicted to cause the individual
> to decompensate; or 3. Current history of 1 or more
> years' inability to function outside a highly
> supportive living arrangement, with an indication of
> continued need for such an arrangement.

The ALJ concluded that Section 12.02 was not met or equaled because the "B" criteria were not satisfied - Plaintiff had, in the ALJ's view, only mild restrictions in activities of daily living and social functioning, moderate restrictions in concentration, persistence, and pace, and no episodes of decompensation - and because "the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. 17).

In his argument on this point, Plaintiff asserts that the ALJ erred, first, by not discussing the "A" criteria or making a finding that they were satisfied. He notes that there was a significant drop in his measured IQ between the dates of the two consultative psychological examinations and that the ALJ improperly dismissed the latter results as not being an accurate estimate of Plaintiff's IQ. He then contends that the ALJ also erred in evaluating the "C" criteria, mainly by failing to find that Plaintiff could not function outside of a highly supported living environment.

As to the first portion of this argument, the Commissioner notes, correctly, that because satisfying the "A" criteria does

not, by itself, entitle a claimant to benefits - such a finding must be coupled with meeting the "B" criteria - any error in this regard is essentially harmless. Despite Plaintiff's effort, in the reply, to counter this argument, the Court finds it persuasive. The "A" criteria are relevant under section 12.02 only if the claimant also satisfies the "B" criteria. Plaintiff has made no argument that he has done that, and there is no evidence in the record suggesting that he can satisfy those criteria. Consequently, it is not necessary to devote any additional discussion to the questions of whether Plaintiff's condition satisfied the "A" criteria or whether the ALJ erred by omitting any discussion of that issue.

As to the "C" criteria, Plaintiff relies primarily on his and his mother's assertions that he does little to nothing on a daily basis and that she takes care of any household chores or other needs. Plaintiff, however, testified that his inactivity was due to his having more bad days than good with respect to his physical condition. As the Commissioner points out, it is not disputed that Plaintiff was still able to drive himself to doctors' appointments, and he told representatives of the Social Security Administration that he could recall matters such as names, months, television programs, and where he parked. (Tr. 319). He told Dr. Swearingen that he left his job for reasons related to his physical condition and to depression and anxiety, and that he maintained a fairly normal daily schedule which including socializing with his girlfriend and visiting her at her home. (Tr. 663). He also "reported areas of intact functioning ...." (Tr. 665).

The ALJ considered the evidence and concluded, as to the "C" criteria, that the evidence simply did not support a finding that any of the subsections of that provision were satisfied. All Plaintiff has done is to show that there is some evidence that, if fully credited, might support a finding that he was living in

a highly structured environment.  But there is substantial
evidence to the contrary.  When that is the case, the Court
simply may not substitute its judgment for that of the ALJ.  That
is, the presence of substantial evidence to support the opposite
conclusion says nothing about whether the record would permit
either conclusion to be drawn, and has consistently been rejected
as a basis for overturning an ALJ's decision.  See, e.g.,
Kalmbach v. Comm'r of Social Security, 409 Fed. Appx. 852, 859
(6th Cir. Jan.7, 2011) ("If substantial evidence supports the
ALJ's conclusion and the ALJ applied the correct legal standards,
we are not at liberty to reverse the ALJ's decision even if
substantial evidence exists in the record that would have
supported an opposite conclusion").  Consequently, there is no
merit to Plaintiff's first assignment of error.

                    B.  Borderline Intellectual Functioning

     Plaintiff's second claim of error is that the ALJ erred by
not finding his borderline intellectual functioning - diagnosed
by Dr. Swearingen - to be a severe impairment.  The Commissioner
responds that this is not a basis for reversal or remand if the
ALJ proceeded to a step four analysis and included in that
analysis any limitations which might have resulted from
impairments deemed not to be severe.  That is a correct statement
of the law; "where an ALJ errs in finding a particular impairment
'non-severe' in step two of the analysis, the error is harmless
if the ALJ finds at least one severe impairment and continues to
address each impairment in determining the claimant's RFC."
Underwood v. Colvin, 2014 WL 347031, *9 (S.D. Ohio Jan.30, 2014),
adopted and affirmed 2014 WL 656642 (S.D. Ohio Feb.19, 2014).
The question is whether the ALJ properly addressed any
limitations which might be attributable to borderline
intellectual functioning when he determined Plaintiff's mental
residual functional capacity.

     Plaintiff does not, either in his statement of errors or his

-11-

reply, identify any specific mental limitations which were both
attributable to his borderline intellectual functioning and were
not accounted for in the mental RFC found by the ALJ.  In fact,
in his reply, he argues that it is unnecessary for him to do so
because he meets Section 12.02 of the Listing of Impairments and
is presumptively disabled.  Although he also claims that his
argument on the Listing issue is inherently an argument that his
borderline intellectual functioning renders him completely unable
to work, the Court has found that the ALJ had a substantial basis
for rejecting that contention.  What the Court is left with,
therefore, is a very non-specific argument about why the ALJ's
error, if any, in not finding borderline intellectual functioning
to be a severe impairment constitutes prejudicial error.

     Here, the diagnosis of borderline intellectual functioning
came from Dr. Swearingen.  Dr. Swearingen concluded that
Plaintiff could apply instructions requiring average intellectual
functioning, could perform simple and multi-step tasks, could get
along with others in a work setting, and would have "some
difficulty" responding to work stress.  The ALJ accommodated
these restrictions by limiting Plaintiff to the performance of
simple, routine, and repetitive tasks performed in a low-stress
environment defined as requiring only occasional decision-making
and only occasional changes in work setting.  Because the ALJ did
take limitations arising from borderline intellectual functioning
into account at step four, any error made at the severe
impairment stage in this case is harmless.  Thus, Plaintiff's
second claim of error provides no basis for reversal or remand.

## VII.  Recommended Decision

     Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be overruled and that judgment be
entered in favor of the Defendant Commissioner of Social
Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

-13-